**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                          |   |                              |
|--------------------------|---|------------------------------|
| **CYNTHIA CLARK,**       | * |                              |
|                          | * |                              |
| **Plaintiffs,**          | * |                              |
|                          | * |                              |
| **v.**                   | * | **Civil Case No.: SAG-18-3672** |
|                          | * |                              |
| **BANK OF AMERICA, N.A.,** | * |                            |
|                          | * |                              |
| **Defendant.**           | * |                              |
|                          | * |                              |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Cynthia Clark ("Plaintiff") filed a Complaint on behalf of herself and a putative class of borrowers who entered into mortgage agreements with Bank of America ("BofA"). BofA filed a Motion to Dismiss, ECF 32, along with a supporting memorandum of law, ECF 32-1. BofA primarily contends that the Maryland law substantiating Plaintiff's claims is preempted by the National Bank Act ("NBA") and by regulations from the Office of the Comptroller of the Currency ("OCC"). Plaintiff filed a response, ECF 34, to which BofA filed a reply, ECF 35. I have considered all of the filings, and find that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons set forth below, BofA's Motion to Dismiss is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The facts are derived from Plaintiff's Complaint, ECF 1, and are largely undisputed. BofA is a federally-chartered bank and one of the largest mortgage lenders in the United States. ECF 1 ¶ 14. As part of its mortgage lending practice, BofA lends money to borrowers for the purchase of residential property. *Id.* ¶ 15. These borrowers enter into a mortgage agreement with BofA,

which states that borrowers must maintain an escrow account for the payment of property-related expenses, such as property taxes and insurance premiums. *Id.* ¶ 18. To facilitate payment of these expenses, borrowers transfer funds to BofA, for placement into the escrow account. *Id.* ¶ 18.

Plaintiff purchased a house in Westminster, Maryland in or about August, 1995. *Id.* ¶ 27. Although Plaintiff originally financed the purchase with a loan from a different company, she entered into a new mortgage agreement, via a Deed of Trust, with BofA on or about February 13, 2013. *See id.* ¶ 28. The Deed of Trust provided that BofA would pay interest on escrowed funds if "Applicable Law requires interest to be paid on the Funds." *Id.* ¶ 29. Plaintiff has continuously made monthly mortgage payments to BofA, which has included a portion to be placed in the escrow account. *Id.* ¶ 31. However, BofA has not paid interest to the Plaintiff on the escrow account and, instead, has generated "float" income for itself. *Id.* ¶ 19, 33.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the

rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650

F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011).  However, a court is not required

to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from

the factual allegations, assuming the truth of only the factual allegations, and then determining

whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the

legal remedy sought.  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011),

*cert. denied*, 566 U.S. 937 (2012).

## III.   ANALYSIS

Maryland law requires lenders to pay interest on funds maintained in escrow on behalf of

borrowers.  Md. Code Ann., Com. Law § 12-109.  The law provides:

> A lending institution which lends money secured by a first mortgage or first deed
> of trust on any interest in residential real property and creates or is the assignee…
> shall pay interest to the borrower on the funds in the escrow account at an annual
> rate not less than the weekly average yield on United States Treasury securities
> adjusted to a constant maturity of 1 year, as published by the Federal Reserve.

Md. Code Ann., Com. Law § 12-109(b)(1).

BofA concedes that it has not paid interest on Plaintiff's escrow account, as required by

the Maryland statute.  *See generally* ECF 32-1.  Instead, BofA has moved to dismiss Plaintiff's

claims on the basis that federal law, via the NBA and the OCC regulations, preempt the

applicability of § 12-109.  BofA has also raised specific arguments about each Count in the

Complaint.  But since preemption, the first basis for dismissal, would apply to all of Plaintiff's

claims, the Court begins the analysis here.

### A.  Preemption of Section 12-109

When the federal government acts within its scope of authority, federal law preempts

inconsistent state law.  *See generally McCulloch v. Maryland*, 17 U.S. 316 (1819).  In the context

of banking in particular, the "grants of both enumerated and incidental 'powers' to national banks… ordinarily pre-empt[] contrary state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996).  The presumption against preemption does not apply to the NBA because, historically, banking is an area with "significant federal presence."  *Nat'l City Bank of Indiana v. Turnbaugh*, 463 F.3d 325, 330–31 (4th Cir. 2006).

Courts in this jurisdiction recognize three types of federal preemption: (1) express preemption, in which Congress directly declares its intent to preempt state law; (2) field preemption, in which Congress occupies a certain field such that no room is left for states to supplement federal law; and (3) conflict preemption, in which state law is preempted to the extent it conflicts with federal law.  *Decohen v. Capital One, N.A.*, 703 F.3d 216, 223 (4th Cir. 2012). Neither express preemption nor field preemption is applicable here.  *See Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 323 (4th Cir. 2012) ("Neither do we find field preemption applicable, as the NBA and OCC regulations do not 'occupy the field.'").  Rather, this case involves conflict preemption, which asks whether the state law at issue "stan[ds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Barnett Bank*, 517 U.S. at 31.  BofA carries the burden of establishing its preemption defense. *See Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F. Supp. 3d 422, 429 (D. Md. 2015) (citing *Pinney v. Nokia, Inc.*, 402 F.3d 430, 446 (4th Cir. 2005)).

**Background on the National Bank Act**

Congress enacted the NBA in 1864, which established the system of national banking that is still in place today.  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10–11 (2007). The NBA vests nationally-chartered banks with the power to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate."  12 U.S.C. § 371(a).  Additionally, national

banks have authority to exercise "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24, Seventh. BofA contends that the NBA preempts § 12-109.

The Supreme Court set forth the appropriate inquiry for assessing the preemptive effect of federal statutes, in the banking context, in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). In *Barnett Bank*, a conflict between federal and state statutes arose in the area of insurance sales. While Congress had enacted a statute authorizing certain national banks to sell insurance in small towns, a Florida statute simultaneously prohibited banks from conducting most insurance sales. *Id.* at 28. When the Florida State Insurance Commissioner ordered a national bank to stop selling the prohibited forms of insurance, in accordance with the state statute, the bank filed for declaratory and injunctive relief in federal court. *Id.* at 29. In analyzing the preemptive effect of the federal statute on appeal, the Court explained that "[t]he question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State?" *Id.* at 30. According to the Court, states retain power to regulate national banks when "doing so does not *prevent or significantly interfere* with the national bank's exercise of its powers." *Id.* at 33 (emphasis added). Based on a thorough examination of the two statutes, the Court concluded that the Florida law was preempted. *Id.* at 34–35 (stating the federal statute "contains no indication that Congress intended to subject that power to local restriction."). After *Barnett Bank*, Congress codified the "prevent or significantly interferes" language in the NBA. 12 U.S.C. § 25b(b). Indeed, both parties agree that the dispositive question in this case is whether § 12-109 prevents or significantly interferes with BofA's exercise of its federal banking powers. *See* ECF 32-1 at 6 ("If the state law 'prevent[s] or significantly interfere[s] with [a] national bank's exercise' of its federal banking powers, it is preempted"); ECF 34 at 6 ("[T]he operative question is whether a

state law requiring BofA to pay borrowers a minimum level of interest on sums held in escrow… *prevents or significantly interferes* with BofA's exercise of its national bank powers.") (emphasis in original).

The landscape for national banking changed dramatically after the Financial Crisis of 2008. In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), in efforts to promote the financial stability of the United States. *See Digital Reality Trust v. Somers*, 138 S.Ct. 767, 773 (2018). As part of Dodd-Frank, Congress enacted several provisions that are relevant to this case. First, Congress codified language requiring national banks to pay interest on escrow accounts, when mandated by state or federal law:

> If prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust, or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law.

15 U.S.C. § 1639d(g)(3).[1] Section 1639d became effective on January 21, 2013. *See Lusnak v. Bank of America, N.A.*, 883 F.3d 1185, 1197 (9th Cir. 2018).

Additionally, Dodd-Frank imposed three critical restrictions on the OCC's authority to enact regulations that preempt state consumer protection laws. Congress (1) codified the *Barnett Bank* preemption standard, 12 U.S.C. § 25b(b)(1), (2) required the OCC to make "case-by-case" determinations about the impact of particular state consumer protection laws, *id.* § 25b(b)(3), and (3) clarified that only *Skidmore* deference applies to the agency's preemption decisions, *id.* § 25b(b)(5)(A).

**Background on OCC Regulations**

The OCC administers the NBA and, as part of this responsibility, oversees the operations of nationally-chartered banks. *Watters*, 550 U.S. at 6. Though Congress has delegated regulation

---

[1] Technically, Congress amended the Truth in Lending Act. *See* Pub. L. No. 111-203, § 1461, 124 Stat. 1376 (codified at 15 U.S.C. § 1639d).

of national banks to the OCC, national banks remain subject to a dual system of federal and state regulation. *See id.* at 12. States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's exercise of its powers. *Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012) (quoting *Watters*, 550 U.S. at 12).

In 2004, several years after the Court's decision in *Barnett Bank*, the OCC issued a regulation, which interpreted preemption under the NBA:

> Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks.

12 C.F.R. § 34.4(a) (effective Jan. 13, 2004). Furthermore, the regulation permitted national banks to exercise their authority to make real estate loans "*without regard to* state law limitations concerning… [e]scrow accounts, impound accounts, and similar accounts." *Id.* § 34.4(a)(6) (emphasis added).

Despite the drastic changes enacted in Dodd-Frank, the OCC has made little revision to its position on preemption of state consumer protection laws. Pertinent here, the OCC declined to alter its list of preempted state laws, and determined that the agency was not bound by Congress's mandate to review state consumer protection laws on a "case-by-case" basis. *See Hymes v. Bank of America, N.A.*, 408 F. Supp. 3d 171, 180 (E.D.N.Y. 2019). Furthermore, the agency declined to materially change the wording of 12 C.F.R. § 34.4. *See* ECF 32-1 at 14 ("Following Congress's enactment of the Dodd-Frank Act in 2011, the OCC reexamined its preemption regulations, including Section 34.4, and 'confirm[ed] that the specific types of laws cited in the rules are consistent with the standard for conflict preemption in the Supreme Court's *Barnett* decision.'") (quoting 76 Fed. Reg. 43,549, 43,557 (July 11, 2011)). Thus, § 34.4 currently provides that "a

national bank may make real estate loans … *without regard to* state law limitations concerning … escrow accounts." 12 C.F.R. § 34.4(a)(6) (2019) (emphasis added).  BofA contends that § 34.4(a) preempts the Maryland statute at issue, § 12-109.

### *Hymes* **and** *Lusnak*

Although the Fourth Circuit has not had occasion to address the preemptive effect of either the NBA or the OCC regulations on state laws requiring payment of interest on escrow accounts, two other jurisdictions have considered this question with respect to similar state statutes.[2]  In *Lusnak v. Bank of America*, 883 F.3d 1185 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 567 (2018), a California law required financial institutions to pay borrowers at least two percent annual interest on funds held in a borrower's escrow account.  *Id.* at 1188.  Since, as here, BofA failed to pay the required interest, the plaintiff filed a putative class action on behalf of borrowers who maintained escrow accounts with BofA.  *Id.*  In response, BofA asserted that the California law was preempted by the NBA.  On appeal, the Ninth Circuit reversed the lower court, and held that the California law "is not preempted because it does not prevent or significantly interfere with Bank of America's exercise of its powers."  *Id.* at 1194.  Among other considerations, the Court found that the language in § 1639d(g)(3) "expresses Congress's view that such laws would not necessarily prevent or significantly interfere with a national bank's operations."  *Id.* at 1194–95 (explaining that "applicable" law "would appear to include any relevant or appropriate state laws that require creditors to pay interest on escrow account funds.").  The OCC agreed with BofA's position in *Lusnak*, and even submitted an amicus brief in support of the petition to rehear the case *en banc*.  *See* 2018 WL 3702582 (Apr. 23, 2018).  The Ninth Circuit did address the OCC's view that such

---

[2] In general, OCC regulations have no less preemptive effect than federal statutes. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes.").

laws are preempted, stating that under *Skidmore*, the agency's regulation is entitled to "little, if any, deference." *See id.* at 1193.

Earlier this year, a judge on the Eastern District of New York reached the same conclusion with respect to the preemptive effect of the NBA on a New York consumer protection law that is nearly identical to § 12-109. In *Hymes v. Bank of America, N.A.*, 408 F. Supp. 3d 171 (E.D.N.Y. 2019), the New York statute at issue required institutions, including national banks, to pay interest on escrow accounts "at a rate of not less than two per centum per year." *Id.* at 177. The Court rejected BofA's contention that the law is preempted. Much like the panel in *Lusnak*, United States District Judge Mauskopf found that § 1639d(g)(3) illustrates a congressional determination that state statutes requiring payment of interest do not significantly impair a national bank's exercise of its federal banking authority. *See id.* at 189 (stating section 1639d(g)(3) is significant "for it evinces a clear congressional purpose to subject *all* mortgage lenders to state escrow interest laws."). With respect to the OCC, Judge Mauskopf found that the Court "has no obligation to defer to" the views expressed in the OCC's amicus brief submitted to the Ninth Circuit. *Id.* at 192. Since the brief consists primarily of an evaluation of case law, which is an analysis that traditionally falls within the competence of the courts, the OCC's interpretation did not implicate the agency's substantive expertise. *Id.* (elucidating the "substantive expertise" exception to deference under *Auer v. Robbins*, 519 U.S. 452 (1997)).

This Court agrees that the OCC's regulation, § 34.4, is entitled to minimal deference under *Skidmore*. Where *Skidmore* deference — rather than *Chevron* deference — is applicable, agency regulations guide a court's inquiry only to the extent of their "power to persuade." *Shipbuilders Council of Am. v. U.S. Coast Guard*, 578 F.3d 234, 241(4th Cir. 2009) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). Here, the Court is not satisfied that the OCC, in the course of

promulgating its regulations in 2004, ever considered whether the NBA preempts state laws that mandate payment of interest for escrow accounts. Notably, the OCC's final rule is devoid of any mention of state escrow interest laws. *See Real Estate Lending and Appraisals*, 69 Fed. Reg. 1904, 1911–12 (Jan. 13, 2004) (describing final amendments to § 34.4). The final rule declared that the amendments to §34.4 were merely intended to codify the existing standard for preemption, as set forth in *Barnett Bank*. *Id.* at 1910 ("The OCC intends this phrase as the distillation of the various preemption constructs articulated by the Supreme Court, as recognized in Hines and Barnett, and not as a replacement construct that is any way inconsistent with those standards.").[3] Moreover, when the OCC updated these regulations in 2011, it did not engage in a substantive reevaluation of preemption, in light of Dodd-Frank. For example, the agency merely reaffirmed that its list of preempted state laws, as codified in the 2004 regulations, remain "consistent with the standard for conflict preemption in the Supreme Court's Barnett decision." *See Dodd-Frank Act Implementation*, 76 Fed. Reg. 43,549, 43,557 (July 21, 2011). Much like the original 2004 regulations, the 2011 update did not specifically refer to state escrow interest laws in any manner. *See Hymes*, 408 F. Supp. 3d at 191 ("It is therefore difficult to conclude that the OCC has ever considered the question before the Court."); *see also Lusnak*, 883 F.3d at 1193 ("Therefore, to the extent that the OCC has largely reaffirmed its previous preemption conclusions without further analysis under the *Barnett Bank* standard … we give it no greater deference than before Dodd-Frank's enactment"). Therefore, the Court will not defer to the OCC's regulation, or to the agency's current position that § 12-109 is preempted.

---

[3] The *Lusnak* Court noted that, based on some phrasing in the final rule, the OCC codified the *Barnett Bank* standard inaccurately. 883 F.3d at 1193.

**Application to Section 12-109**

Under *Barnett Bank*, the critical question is whether § 12-109 "prevents or significantly interferes" with BofA's ability to exercise its federal banking authority. For similar reasons as those expressed in *Lusnak* and *Hymes*, this Court concludes that § 12-109 is not preempted by the NBA or by the OCC's regulations.

**1. Impact of § 1639d**

As an initial matter, Plaintiff and BofA maintain adverse positions regarding what Congress intended to convey about preemption with the words "applicable state[] law," in § 1639d(g)(3) of Dodd-Frank. Plaintiff contends that "applicable" refers to the fact that not all states have escrow interest laws. *See* ECF 34 at 18. BofA, on the other hand, argues that "applicable" essentially means "not preempted." *See* ECF 32-1 at 19 ("Congress's use of the word 'applicable' reflects its recognition that laws like Section 5-601 would not always apply in certain situations, as in the case of state laws preempted by the National Bank Act and OCC regulations."). While the *Lusnak* Court's analysis comports with Plaintiff's position here, *see* 883 F.3d at 1195 ("The inclusion of this term makes sense because not every state has escrow interest laws."), the *Hymes* Court found that § 1639d(g)(3) "has nothing to say about preemption one way or the other," 408 F. Supp. 3d at 187.

Although Dodd-Frank does not define the term "applicable," the Supreme Court expounded upon the meaning of this word in a different statute:

> "Applicable" means "capable of being applied: having relevance" or "fit, suitable, or right to be applied: appropriate." Webster's Third New International Dictionary 105 (2002). *See also* New Oxford American Dictionary 74 (2d ed. 2005) ("relevant or appropriate"); 1 Oxford English Dictionary 575 (2d ed. 1989) ("[c]apable of being applied" or "[f]it or suitable for its purpose, appropriate"). So an expensive amount is "applicable" within the plain meaning of the statute when it is appropriate, relevant, suitable, or fit.

*Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011).

This Court concludes that Congress did not refer to preemption, in any direct manner, with the words "applicable state[] law." Rather, consistent with the Supreme Court's guidance from *Ransom*, the better reading of § 1639d is that lenders should pay interest on escrow accounts when state laws requiring these payments are "relevant." The Court reaches this determination based upon the larger context of the statutory phrase, and upon other uses of "applicable" in the same statute.

It is a "'cardinal rule' of statutory interpretation that 'statutory language must be read in context [because] a phrase gathers meaning from the words around it.'" *Johnson v. Zimmer*, 686 F.3d 224, 233 (4th Cir. 2012) (quoting *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 596 (2004)). Here, the pertinent statutory phrase includes not only state law, but refers to "Applicable State *or Federal* law." § 1639d(g)(3) (emphasis added). Since preemption would not apply to federal law, Congress likely would not have intended to implicate preemption with this phrase. *See Broughman v. Carver*, 624 F.3d 670, 677 (4th Cir. 2010) (explaining that courts have a "duty to give effect, if possible, to every clause and word of a statute") (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Furthermore, the phrase at issue is not the only use of "applicable" in § 1639d. In total, "applicable" appears ten times in the statute. For example, Congress employed the word "applicable" in the general provision about escrow accounts:

> No impound, trust, or other type of account for the payment of property taxes… may be required as a condition of a real property sale contract or a loan… except when …
>
> (3) the transaction is secured by a first mortgage or lien on the consumer's principal dwelling having an original principal obligation amount that –
>
> > (A) does not exceed the amount of the maximum limitation on the original principal obligation of mortgage in effect for a residence of the *applicable* size…

§ 1639d(b)(3) (alterations in formatting) (emphasis added).

This use supports the conclusion that "applicable" means "relevant" or "appropriate," as the Supreme Court explained in *Ransom*. Indeed, in assessing whether a creditor must establish escrow accounts, Congress dictated that parties consider the *relevant* maximum limitation on a mortgage principal, as determined by the size of a residence. BofA's preferred interpretation, *i.e.*, defining "applicable" to mean "able to be applied," ECF 32-1 at 18, would create an unnatural meaning for this provision, since there will seemingly always be *some* size for a given residence. *See SEC v. Sloan*, 436 U.S. 103, 112 (1978) ("While perhaps not an impossible reading of the statute, we are persuaded it is not the most natural or logical one."). Certainly, this use of "applicable" has no connection to preemption, further undercutting the likelihood that Congress referred to preemption in § 1639d(g)(3). *See Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472 (4th Cir. 2011) (recounting the normal rule that "Identical words used in different parts of the same act are intended to have the same meaning.") (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934)). Accordingly, this Court concurs with the determination, in both *Hymes* and *Lusnak*, that with the word "applicable," Congress "did not intend to create a preemption-based exception for national banks." *Hymes*, 408 F. Supp. 3d at 189; *see also Lusnak*, 883 F.3d at 1195–96.[4]

## 2. Interference with BofA's Federal Banking Powers

As detailed above, § 1639d represents a congressional determination that mortgage lenders should be subject to state escrow interest laws. In any event, this Court's decision does not rest primarily on an interpretation of § 1639d. Rather, § 12-109 does not prevent or significantly

---

[4] In fact, the *Lusnak* Court found that Congress "used the term 'applicable' to refer to state escrow interest laws where they exist." 883 F.3d at 1195. This Court does not go as far as the *Lusnak* panel and, instead, concludes that Congress did not contemplate preemption in any manner with its use of "applicable" in § 1639d(g)(3).

interfere with BofA's exercise of its federal banking authority, because § 12-109's "interference" is minimal, when compared with statutes that the Supreme Court has previously found were preempted. In the seminal *Barnett Bank* case, as explained above, a federal statute authorized national banks to sell insurance, while a competing Florida statute prevented national banks from doing so. 517 U.S. at 28–29. Since the Florida law essentially nullified the bank's authority under federal law, the "significant interference" threshold was easily met. Similarly, in *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), a federal statute authorized national banks to receive savings deposits, *id.* at 375, but a New York law prohibited these banks from including the word "savings" in their advertisements, *id.* at 374 n.1. The Supreme Court concluded that, by preventing banks from communicating with customers about relevant services, New York's legislature had, in essence, abrogated the banks' authority under the federal statute. *See id.* at 377–78 ("We cannot believe that the incidental powers granted to national banks should be construed so narrowly as to preclude the use of advertising in any branch of their authorized business."). By contrast, § 12-109 does not reach any similar level of interference. Whereas the state statutes in *Barnett Bank* and *Franklin National Bank* hampered the banks' ability to exercise the relevant federal authority in any form, Maryland's law still allows BofA to require escrow accounts for its borrowers. *Cf. Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 323–24 (4th Cir. 2012) (concluding that Maryland law imposing notice requirements for repossession was not preempted by OCC regulations because, in part, the law did not prevent the bank from exercising its federal authority to collect on debts). The law merely provides that, if BofA chooses to maintain escrow accounts, then it must pay a small amount of interest to the borrowers on their funds. In

fact, BofA's suggestions about interference are belied by the fact that its direct competitors dutifully comply with § 12-109.  *See* ECF 34 at 1.[5]

Even so, the Court is not unsympathetic to BofA's contention that the cumulative effect of compliance with inconsistent state regimes will impact its ability to conduct real estate loans.  *See* ECF 32-1 at 12; *see also Turnbaugh*, 463 F.3d at 332 ("When national banks are unable to operate under uniform, consistent, and predictable standards, their business suffers").  The preempted law in *Turnbaugh* permitted the Maryland Commissioner of Financial Regulation "to exercise visitorial powers and to limit prepayment penalties" for loans originated by national bank subsidiaries.  *Id.* at 328.  The OCC had issued regulations that exempted subsidiaries of national banks from state regulation, to the same extent that national banks were exempted.  *Id.* at 329.  Since the parties agreed that Maryland's law conflicted with the OCC regulations, the only question for the Fourth Circuit was whether the OCC had exceeded its authority in promulgating those regulations.  *Id.* at 331.  The panel applied *Chevron* deference to the pertinent regulations, and ultimately concluded that the OCC had not exceeded its authority.  *See id.* at 332–33.  Here, given Congress's pronouncements in Dodd-Frank, it cannot be said that state escrow interest laws "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Indeed, whereas *Hymes* and *Lusnak* found that laws like § 12-109 are not preempted, the 2006 *Turnbaugh* decision joined three other

---

[5] Furthermore, the Court notes the terms of a settlement agreement in the *Lusnak* litigation. *Donald Lusnak v. Bank of America, N.A.*, No. 14-cv-01855-GHK (C.D. Cal. 2014); *see also Stephens v. Cty. of Albemarle*, 2005 WL 2076417, at *3 (W.D. Va. Aug. 26, 2005) (explaining that a court may take judicial notice of public court records without converting a motion to dismiss into one for summary judgment) (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997)). In addition to paying a significant amount to class members for unpaid interest, BofA changed its policies and practices in 2019, to begin paying interest for all residential mortgage escrow accounts in California. *Id.* at ECF 112-1 (Class Action Settlement Agreement, stating "beginning in 2019, [BofA] will pay interest on the funds in all such mortgage escrow accounts"). BofA's contention, that complying with state escrow interest laws would be financially ruinous, is further undermined by its change of policy in California.

circuit courts by ruling in favor of the OCC's position in that case, *id.* at 333 ("We join the Second, Sixth, and Ninth Circuits in finding that the OCC did not exceed its delegated authority.").

BofA also identifies cases from other jurisdictions, in which courts found that merely *frustrating* a national bank's federal authority was sufficient to render the relevant state laws preempted. *See, e.g.*, *SPGGC, LLC v. Ayotte*, 488 F.3d 525 (1st Cir. 2007) (concluding that the NBA preempted New Hampshire law preventing national banks from selling gift cards that carry expiration dates and administrative fees); *Smith v. Wells Fargo Bank, N.A.*, 158 F.Supp. 3d 91 (D. Conn. 2016) (concluding that the NBA preempted state law imposing heightened disclosure requirements for loan documents). However, none of the cases cited by BofA contradicts the central point that national banks remain subject to state laws that do not prevent or significantly interfere with their relevant federal authority.[6] *Cf. Decohen*, 703 F.3d at 226 (quoting *Watters*, 550 U.S. at 11) ("[N]ational banks 'are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA.'"). Moreover, this case is distinct from those cited by BofA, in that Congress, in Dodd-Frank, expressed its judgment that national banks can and should adhere to statutes like § 12-109. *See* § 1639d(g)(3). And, "[g]iven that the purpose of a preemption inquiry is to determine congressional intent, the Court cannot disregard the latest word from Congress." *Hymes*, 408 F. Supp. 3d at 196. Dodd-Frank changed the landscape of banking regulation and, in doing so, indicated that state statutes requiring payment of interest on escrow accounts are a viable means of consumer protection within the dual regime of federal and state regulation.

---

[6] In several of the cases cited by BofA, the Court invoked *Chevron* deference, because the decision pre-dated Dodd-Frank's determination that only *Skidmore* deference should apply. *See, e.g.*, *Turnbaugh*, 463 F.3d at 331 (applying framework from *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984)); *Ayotte*, 488 F.3d at 532 ("We must defer to these regulations because they are not "unreasonable, unauthorized, or inconsistent.").

Accordingly, this Court holds that § 12-109 does not prevent or significantly interfere with BofA's ability to conduct real estate loans, and thus, is not preempted by the NBA or by OCC regulations.

## B. Breach of Contract

Maryland law allows parties to recover on claims for breach of contract. *See, e.g.*, *Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 934 (Md. Ct. Spec. App. 2007). In Count I, Plaintiff alleges that BofA breached its mortgage agreements "by failing to comply with federal and Maryland state law requiring interest to be paid." ECF 1 ¶ 50. In the Deed of Trust, BofA provided that it would pay interest on Plaintiff's escrow account if "Applicable law requires interest to be paid on the Funds." *Id.* ¶ 29. While BofA argues that a preempted law cannot be "Applicable," ECF 32-1 at 25, the preceding section explains that § 12-109 is not preempted. Accordingly, Plaintiff has made a plausible claim that by failing to pay interest on her escrow account, BofA breached its contract with Plaintiff.

## C. Unjust Enrichment

A claim for unjust enrichment consists of three elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007). The Complaint plausibly alleges that BofA leveraged Plaintiff's escrow account to generate "float" income for itself, instead of paying interest on these funds to Plaintiff, as required by state law. ECF 1 ¶ 33. Accordingly, all three elements of an unjust enrichment claim are plausibly alleged.

BofA also argues that Plaintiff's claim is precluded by the existence of the written contract between the parties. ECF 32-1 at 26. Under Maryland law, "generally, quasi-contract claims such

as … unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000). However, this restriction does not apply when a defendant contests liability under the relevant written contract. *See Vu Hoang v. Georgetown Contractors, Inc.*, 2010 WL 4485729, at *3 (D. Md. Nov. 9, 2010) ("Here, Defendant in its answer denies any contractual liability and therefore, even though Plaintiffs have brought a cause of action for breach of contract, they are not precluded from bringing other quasi-contract claims, including unjust enrichment."). Moreover, "Plaintiffs may plead alternatively under a theory of Breach of Contract and Unjust Enrichment." *Id.*; *see also Swedish Civil Aviation Admin. v. Project Mgmt. Enters.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002) (explaining that the Federal Rules of Civil Procedure allow parties to state claims "regardless of consistency"). BofA contests liability under the Mortgage Agreement by, *inter alia*, questioning whether the contract constitutes an "agree[ment] to comply" with Maryland's statute. ECF 32-1 at 24–25. Accordingly, at this stage, Plaintiff can maintain her claim for unjust enrichment.

### D. Maryland Consumer Protection Act ("MCPA")

The MCPA provides a cause of action for consumers to recover for injury or loss caused by "unfair, abusive, or deceptive trade practices" with respect to "[t]he extension of consumer credit." Md. Code Ann., Com. Law § 13-303(4), § 13-408(a). To state a claim under the MCPA, a plaintiff "must adequately plead that: (1) the defendant engaged in an unfair or deceptive practice or misrepresentation, (2) the plaintiff relied upon the misrepresentation, and (3) doing so caused the plaintiff actual injury." *Barr v. Flagstar Bank, FSB*, 303 F.Supp. 3d 400, 416 (D. Md. 2018) (citation omitted). Plaintiff contends that BofA made several misrepresentations, all related to its failure to pay interest on escrowed funds. Namely, BofA agreed, in the Deed of Trust, that it would

"comply with applicable state and federal law," and also sent a separate notice, stating that it was not required to pay interest on escrow accounts. Additionally, since BofA admittedly did not pay interest, Plaintiff argues that the periodic account statements sent to borrowers "misstated the actual amounts owed to BofA by the mortgagors." ECF 34 at 28; *see also* ECF 1 ¶ 71–73.

Plaintiff has made the requisite showing to survive dismissal. As explained above, §12-109 is not preempted by federal law. Based on this legal conclusion, Plaintiff's Complaint plausibly alleges that BofA made several misrepresentations to borrowers, related to their mortgages. For example, if BofA failed to uphold its legal obligation to pay interest on escrow accounts, then the periodic account statements issued to Plaintiff may have misstated or inflated her level of indebtedness. BofA counters that "there is nothing false or misleading about an escrow statement that accurately reflects the fact that no interest was paid." ECF 32-1 at 28. Although BofA may have, in good faith, believed that it had no obligation to pay interest, § 13-301(1) of the MCPA has no scienter requirement. *Luskin's, Inc. v. Consumer Prot. Div.*, 726 A.2d 702, 718 (Md. 1999). Thus, courts have found plausible claims for relief where companies *mistakenly* overcharged consumers. *See, e.g.*, *Healy v. BWW Law Group, LLC*, 2017 WL 281997, at *4–5 (D. Md. Jan. 23, 2017).[7] Nonetheless, taking the allegations in the Complaint as true — as the Court must at this stage — Plaintiff has plausibly alleged that BofA sent these statements with full knowledge that their contents were inaccurate. In other words, Plaintiff has alleged that BofA was well-aware of its legal obligation to pay interest and, despite this knowledge, supplied contradictory information to consumers via the Deed of Trust, separate notice, and periodic

---

[7] Plaintiff's Complaint requests relief for violation of § 13-301, *et seq.* ECF 1 at 9. No scienter requirement applies to the category of deceptive trade practices in § 13-301(1). But subsection (9), for example, does require proof of scienter. *See Myles v. Rent-A-Center, Inc.*, 2016 WL 3917212, at *8 n.9 (D. Md. July 19, 2016). At this stage, Plaintiff has plausibly alleged a violation of the MCPA, with or without the scienter requirement.

account statements. Furthermore, Plaintiff has plausibly alleged that she relied on the misrepresentation by continuing to pay the incorrect amounts, thereby causing actual injury. Accordingly, the three elements of an MCPA claim are satisfied.[8]

Importantly, the MCPA contains a three-year statute of limitations. Md. Code Ann., Cts. & Jud. Proc. § 5-101. Even so, Maryland has adopted a "discovery rule, which tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury." *Windesheim v. Larocca*, 116 A.3d 954, 962 (Md. 2015). BofA has made a compelling argument that Plaintiff should have been aware of the facts substantiating its MCPA claim in 2013, when it was clear that BofA would not pay interest on escrow accounts. *Miller v. Pacific Shore Funding*, 224 F.Supp. 2d 977, 986 (D. Md. 2002) ("Knowledge of *facts*, however, not actual knowledge of their legal significance, starts the statute of limitations running.") (emphasis in original). Nonetheless, the Court will not dismiss Plaintiff's claim at this time. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (explaining that an affirmative defense, such as statute of limitations, should rarely be ruled on in a motion to dismiss). BofA may demonstrate, over the course of discovery, that Plaintiff was or should have been aware of the facts underlying her claim. But at a minimum, Plaintiff has stated a plausible cause of action for violations of the MCPA, for the three years immediately preceding the filing of this lawsuit.

---

[8] Finally, BofA contends that Plaintiff has failed to meet Rule 9(b)'s heightened pleading requirement. *See* Fed R. Civ. Proc. 9(b). However, Plaintiff has stated with particularity how BofA's actions were false and misleading. Moreover, BofA has "sufficient information to formulate [its] defense." *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

**E. Truth in Lending Act ("TILA")**

In its Motion to Dismiss, BofA asserts that Plaintiff's TILA claims are time-barred, because the TILA has a one-year statute of limitations. ECF 32-1 at 26. Plaintiff, in response, has requested that the Court "[d]ismiss its TILA Claim *without prejudice*." ECF 34 at 31 (emphasis added). However, Plaintiff neglected to explain how any amendment would cure the statute of limitations defect, as identified by BofA. Under these circumstances, the Court "exercises its discretion to dismiss this [count] with prejudice as it appears no amendment can cure the deficiencies inherent in Plaintiff's complaint." *Bartley v. Wells Fargo Bank, NA*, 2015 WL 5158708, at *4 n.1 (D.S.C. Sep. 2, 2015).

**IV.    CONCLUSION**

For the reasons set forth above, BofA's Motion to Dismiss, ECF 32, is granted in part and denied in part. Count V is dismissed with prejudice. The remainder of the Motion is denied. A separate Order follows.


Dated: February 24, 2020                                        /s/
                                                        Stephanie A. Gallagher
                                                        United States District Judge